No. 04-118

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 284

PETER R. SHERNER and DEBORAH SHERNER,

      Plaintiffs and Appellants,

   v.

NATIONAL LOSS CONTROL SERVICES CORPORATION,
CONOCO, INC., CRAWFORD & COMPANY, CATHY
ANDERSEN and JOHN DOES I-V,

      Defendants and Respondents.

APPEAL FROM:    District Court of the Thirteenth  Judicial District,
                In and For the County of Yellowstone, Cause No. DV-02-0009
                Honorable G. Todd Baugh, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Gene R. Jarussi; Jarussi & Bishop, Billings, Montana
            Jeremiah C. Lynch, Attorney at Law, Great Falls, Montana

      For Respondents:

            Robert M. Carlson; Corette, Pohlman & Kebe, Butte, Montana
            (For National Loss Control Service Corporation)

            David A. Veeder, Jolane D. Veeder; Veeder Law Firm, Billings, Montana
            (For ConocoPhillips)

            Ian McIntosh; Crowley, Haughey, Hanson, Toole & Dietrich, Bozeman
            Montana (For Crawford & Company and Cathy Andersen)

                       Submitted on Briefs:  August 18, 2005

                                   Decided:  November 15, 2005

Filed:

              _____
                             Clerk
Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 Peter R. Sherner (Peter) and Deborah Sherner (collectively, the Sherners) appeal from an order of the Thirteenth Judicial District Court, Yellowstone County, granting summary judgment dismissing all their claims and awarding costs to the defendants. We affirm in part, reverse in part and remand.

¶2 We restate the issues on appeal as follows:

¶3 1. Did the District Court err in granting summary judgment to Cathy Andersen on the basis that she acted within the course and scope of her employment?

¶4 2. Did the District Court err in granting summary judgment to all defendants based on § 33-1-1210, MCA, which generally grants immunity to those who report insurance fraud?

¶5 3. Did the District Court err in granting summary judgment to all defendants on the malicious prosecution claim?

¶6 4. Did the District Court err in setting the amount of costs awarded to three defendants?

¶7 The Sherners also challenge the District Court's conclusions that the Workers' Compensation Court has exclusive jurisdiction over this case and that the claims against Conoco must fail based on *res judicata*, and argue that the District Court erred in dismissing their claims based on negligence, negligent and intentional infliction of emotional distress and violation of statutory and constitutional rights. Based on our decision on the merits of Issues One and Two, it is unnecessary to further consider these claims.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

¶8 Peter was seriously injured in August of 1995 as a result of exposure to hydrogen sulfide gas while working at the Conoco refinery in Billings, Montana. Conoco is a self-insured employer under the Montana Workers' Compensation Act. Peter continues to receive workers' compensation benefits because of his injuries.

¶9 The Sherners brought suit against Conoco and its employees, alleging their intentional and negligent acts resulted in Peter's injuries. *See Sherner v. Conoco, Inc.*, 2000 MT 50, 298 Mont. 401, 995 P.2d 990 (*Sherner I*). The Sherners eventually obtained a $1.9 million judgment in that lawsuit, which Conoco paid in September 2001.

¶10 In January of 2002, the Sherners filed their complaint in the present case against Conoco, National Loss Control Services Corporation (National), Crawford & Company (Crawford) and Cathy Andersen (Andersen), a Crawford claims adjuster. They allege the defendants acted with malice in encouraging the State Auditor to investigate Peter for allegedly defrauding his insurer, which resulted in criminal charges against him. The Sherners sought damages for intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of their statutory and constitutional rights. The complaint also sought damages for malicious prosecution. The Sherners' complaint in the action underlying this appeal was based on the following facts and events after Peter's injury.

¶11 National has been the adjuster for Peter's claims since his injury. Intermountain Claims (Intermountain) served as National's local claims adjuster in Montana until January

3

of 1998, at which time Crawford took over its duties. In June of 1996, Peter requested home health care assistance. After receiving confirmation from Peter's treating physicians that home health care was medically necessary, Intermountain authorized a home health care attendant for Peter for nine hours a day, seven days a week, subject to periodic review. The home health care attendant was to provide light housekeeping and personal care assistance.

¶12 Tracey Sherner (Tracey), the Sherners' daughter-in-law, initially provided the care. She submitted time sheets and a bill totaling $9,000 for services in 1996. However, an investigator for Intermountain conducted surveillance and found that Tracey was not actually with Peter at all times for which she billed. Intermountain filed a workers' compensation petition against Tracey alleging fraud. The dispute was settled in May of 1997, and Intermountain informed the Sherners, through their attorney, that Peter's home health care must be provided by a properly certified and licensed home health care aide and not by a family member.

¶13 In November of 1996, the Sherners chose their neighbor Bernice Corcoran (Bernice) to provide home health care services. Bernice was not a certified home health care aide when she started, but attended classes at a local nursing home and earned her certification while providing services for Peter.

¶14 On November 28, 1997, the Governor's Fraud Hot Line received an anonymous call that Bernice had been submitting time sheets claiming to have provided services to Peter which she had not provided. Intermountain was notified and tried to verify with Peter's doctor whether he was still in need of home care. The doctor Intermountain had previously

4

consulted was no longer providing Peter's health care.

¶15 In January of 1998, Crawford replaced Intermountain as National's local claims adjuster. In January of 1999, Crawford adjuster Andersen noted discrepancies in Bernice's billing statements. Crawford requested evaluation of Peter by his treating physician, who verified that Peter's maximum of nine hours a day of home health care was necessary and appropriate.

¶16 Crawford then hired a private investigator from BCI, Inc., to observe Bernice and determine if she was actually providing care to Peter at the times claimed. BCI's surveillance revealed that Bernice was not with Peter on some days for which she billed. Crawford also interviewed both Peter and Bernice, and confirmed that Bernice was not providing all the services for which she billed. Accordingly, Bernice's services were terminated on November 17, 1999.

¶17 National then referred its concerns regarding Bernice's services to the State Auditor-- the *ex officio* insurance commissioner in Montana--whose office conducted its own investigation into the matter. In response to a written request, National and Crawford each provided the State Auditor with copies of all of the documents each possessed relating to Peter's workers' compensation claims, and otherwise cooperated with the State Auditor's investigation. The State Auditor also obtained payroll records from Saint Vincent Hospital, where Bernice worked part-time, and discovered that Bernice was working there during some of the times she claimed to have been providing home care to Peter. Bernice later admitted to having "double billed" her time.

5

¶18 On January 29, 2001, with the State Auditor's attorney--who had been specially deputized as a deputy county attorney--serving as the prosecutor, the Yellowstone County Attorney filed criminal charges against Peter and Bernice. The Information filed on behalf of the State of Montana charged Peter with felony theft by common scheme because he signed the fraudulent bills Bernice submitted.

¶19 During discovery, Bernice admitted she had "subcontracted" with the Sherners' son, Trevor, to pay him $400 a month to provide some of his father's home health care. Neither Bernice nor the Sherners ever reported this arrangement to anyone at Conoco, Intermountain or Crawford. Trevor kept no records of when he provided services, and he was not a certified home health care provider. Deborah Sherner admitted that, despite her knowledge that family members were prohibited from providing Peter's home health care, she arranged the subcontract between Bernice and Trevor.

¶20 The State later moved to dismiss the criminal charge against Peter, and the charge was dismissed on March 1, 2001. Bernice ultimately pled guilty to felony theft by common scheme.

¶21 The Sherners filed the complaint in the present case on January 4, 2002. They sought damages on the basis of allegations that Conoco, National, Crawford, and Andersen instigated the criminal proceedings against Peter and withheld information from the State Auditor that negated the allegations of wrongdoing against him. Andersen moved for summary judgment and the District Court granted her motion in March of 2003. The remaining defendants also moved for summary judgment and, after a hearing, the District

6

Court granted all defendants' motions on December 9, 2003, stating the defendants would be awarded their costs.

¶22 Conoco, Crawford and National submitted bills of costs on December 16, 2003. On December 17, 2003, the District Court entered judgment against the Sherners and assessed costs in the full amount sought by these defendants. On January 6, 2004, the court filed an order entitled "Notice," apparently entered *sua sponte*, in which it stated it had taxed costs on December 31, 2003, as requested by defendants after noting no objections by the Sherners. Attached to the court's order was a copy of the December 17, 2003 judgment. This appeal followed.

## STANDARD OF REVIEW

¶23 This Court's review of a district court's grant of summary judgment is *de novo* and we apply the criteria contained in Rule 56, M.R.Civ.P. The party moving for summary judgment bears the initial burden of establishing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. If this burden is met, the burden shifts to the nonmoving party to prove, by more than mere denial and speculation, that a genuine issue of material fact exists which precludes summary judgment. We review a district court's legal determinations to determine whether the conclusions are correct. *Farmers Union Mut.Ins. Co. v. Staples*, 2004 MT 108, ¶ 18, 321 Mont. 99, ¶ 18, 90 P.3d 381, ¶ 18 (citations omitted).

## ISSUE ONE

7

**¶24 Did the District Court err in granting summary judgment to Andersen on the basis that she acted within the course and scope of her employment?**

¶25 The Sherners first argue that the District Court erred when it concluded Andersen's conduct fell within the scope of her employment as an adjuster for Crawford and, therefore, she was not subject to personal liability for her actions. Generally, employees and agents of a corporation are shielded from personal liability for acts taken on behalf of the corporation. *Phillips v. Montana Ed. Ass'n* (1980), 187 Mont. 419, 424-25, 610 P.2d 154, 157-58. The Sherners argue that a reasonable jury could have concluded that Andersen was personally liable under § 28-10-702(3), MCA, which states that an agent is personally responsible to third persons for the agent's wrongful acts.

¶26 We have interpreted § 28-10-702(3), MCA, to mean that "[i]n order to hold a corporate agent personally liable, the [trial] court must find that the agent was personally negligent or that the agent's actions were tortious in nature." *Crystal Springs Trout Co. v. First State Bank of Froid* (1987), 225 Mont. 122, 129, 732 P.2d 819, 823. "The personal nature of the agent's actions forms the narrow exception to the general policy that officers and agents of a corporation must be shielded from personal liability for acts taken on behalf of the corporation." *Crystal Springs*, 225 Mont. at 129, 732 P.2d at 823 (citation omitted).

¶27 Conclusory statements are not sufficient to defeat a motion for summary judgment. *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903 (citation omitted). Here, the record contains no evidence that would show Andersen did anything

more than simply report what she found in her employer's records or learned after investigation to further her employer's interests. Other than the Sherners' unsupported conclusions, there is no indiction that Andersen acted negligently or other than within the course and scope of her employment in handling Peter's case, or when she noted and reported the discrepancies she found in Peter's claims.

¶28 We hold that the District Court did not err when it concluded Andersen acted within the scope of her employment and, thus, was immune from personal liability.

## ISSUE TWO

¶29 **Did the District Court err in granting summary judgment to all defendants based on § 33-1-1210, MCA, which generally grants immunity to those who report insurance fraud?**

¶30 The Sherners argue the District Court erred in concluding that Conoco, National and Crawford were immune from all civil liability under § 33-1-1210(1), MCA. They assert substantial evidence of record indicated that the defendants acted with malice.

¶31 Section 33-1-1210(1), MCA, provides:

> *In the absence of malice*, an insurer, an officer, employee, or producer of the insurer, an independent adjuster, an administrator, a consultant, or any private person is not subject to civil liability for filing reports, providing information, or otherwise cooperating with an investigation or examination of insurance fraud conducted by the commissioner.

(Emphasis added.) Malice is not defined in Title 33 of the Montana Code Annotated, but it is defined in §§ 1-1-204(3) and 27-1-221(2), MCA. We have not previously determined

9

which statutory definition of malice applies with respect to § 33-1-1210(1), MCA.

¶32   Section 1-1-204(3), MCA, defines malice as a wish to vex, annoy, or injure another person or an intent to do a wrongful act, established either by proof or presumption of law. We applied an earlier version of the § 1-1-204(3), MCA, definition of malice in a tort action in which the plaintiff recovered property damages from a company that negligently severed a sewage line during an excavation project. *See Spackman v. Ralph M. Parsons Co.* (1966), 147 Mont. 500, 510, 414 P.2d 918, 923. In *Sherner I*, ¶ 37, we adopted the definition of malice contained in § 27-1-221(2), MCA, for purposes of determining whether an employer acts with malice under the workers' compensation statutes.

¶33   The present issue relates to the tort claims of negligence, intentional and negligent infliction of emotional distress and defamation, and to the claims of violation of statutory and constitutional rights. The Sherners suggest that the § 1-1-204(3), MCA, definition of malice likely applies because § 1-1-204, MCA, states that the definitions contained therein apply "[u]nless the context requires otherwise[.]" We agree with the Sherners that, here, "the context does not require otherwise." Thus, we conclude the § 1-1-204(3), MCA, definition of malice applies to § 33-1-1210(1), MCA.

¶34   The Sherners base their claim of malicious prosecution on their perception that National and Crawford, as agents of Conoco in its role as the insurer, maliciously targeted Peter because he was performing physical activities that led them to believe he did not require domiciliary care. The Sherners then argue that since Peter's treating physician

10

authorized him to engage in such activities, National and Crawford acted with malice when they investigated him. They further allege these defendants withheld information from the State Auditor regarding Peter's physical condition that would absolve him of wrongdoing.

¶35 The Sherners' arguments miss the point. Peter was charged with felony theft by common scheme because he signed the fraudulent bills submitted by Bernice. The charges did not relate to whether he was physically impaired so as to warrant domiciliary care. Thus, information concerning his physical condition, whether National and Crawford provided it to the State Auditor or not, was not relevant to the charge which underlies the malicious prosecution claim. Nothing in the record indicates that Crawford or National acted with malice in investigating Peter's claim.

¶36 On the contrary, the facts clearly indicate Crawford and National were simply doing their jobs when they investigated Peter's claim. On November 28, 1997, the Governor's Fraud Hot Line received an anonymous call that Bernice had submitted time sheets fraudulently claiming to have provided services to Peter. Based on this information, Crawford, which had recently taken over as the local adjuster from Intermountain, initiated an investigation of Bernice. The investigation revealed that Bernice was not, in fact, with Peter at many of the times she claimed to be providing him with care. Pursuant to § 33-1-1205(2), MCA, an insurer, independent adjuster or employee of an insurer who has reason to believe an insurance fraud has been or is being committed must provide notice to the State Auditor within 60 days of discovery of the possible fraud. Conoco, Crawford, National and

11

Andersen had a statutory duty to provide notice of what they had discovered to the State Auditor. The defendants then were required to cooperate fully with the investigation. *See* § 33-1-1205(1), MCA.

¶37 National and Crawford met their statutory duty by providing the results of their investigation to the State Auditor. The State Auditor then performed an independent investigation, gathered additional information and independently concluded that charges should be filed against Bernice and Peter. Finally, the prosecuting attorney testified by deposition that he was solely responsible for making the decision to file charges against Peter, and that he was not pressured by the defendants to prosecute the case. Under these circumstances, it is clear that the defendants did not act with malice. They acted in accordance with the law.

¶38 We conclude that the Sherners have failed to present evidence creating a genuine issue of material fact as to whether the defendants acted with malice. They simply made no showing that the defendants' conduct indicated "a wish to vex, annoy, or injure" them or any "intent to do a wrongful act." *See* § 1-1-204(3), MCA. In the absence of malice, the defendants are not subject to civil liability for cooperating with an investigation of insurance fraud. We hold that the District Court did not err in granting summary judgment to all defendants based on the immunity set forth in § 33-1-1210, MCA.

### ISSUE THREE

¶39 **Did the District Court err in granting summary judgment to all defendants on the**

**malicious prosecution claim?**

¶40    The Sherners claim the defendants were responsible for instigating the criminal charges against Peter, and that they did so with malice.  They argue that the District Court erred in granting summary judgment to the defendants because there are facts in the record sufficient to sustain a civil claim for malicious prosecution.

¶41    In an action for malicious prosecution, the plaintiff must establish each of the following elements:

(1) a judicial proceeding was commenced and prosecuted against the plaintiff;
(2) the defendant was responsible for instigating, prosecuting or continuing such proceeding;
(3) there was a lack of probable cause for the defendant's acts;
(4) the defendant was actuated by malice;
(5) the judicial proceeding terminated favorably for plaintiff; and
(6) the plaintiff suffered damage.

*Plouffe v. Montana Dept. of Public Health and Human Services*, 2002 MT 64, ¶ 16, 309 Mont. 184, ¶ 16, 45 P.3d 10, ¶ 16 (citations omitted).  If the plaintiff fails to offer proof of any one of these elements, the action fails, and summary judgment in favor of the defendant is proper.  *See White v. Murdock* (1994), 265 Mont. 386, 389-90, 877 P.2d 474, 476 (citation omitted).  The District Court concluded the Sherners had not offered evidence to support the elements of malicious prosecution, and granted summary judgment for the defendants.

¶42    There is no question that the first element necessary to establish malicious prosecution is present in this case.  A criminal case was commenced against Peter.

13

¶43 We have already discussed the facts of this case relating to the second element of malicious prosecution. The State Auditor and prosecutor acted independently on the basis of their investigations and the defendants were not responsible for instigating, prosecuting or continuing the criminal proceeding.

¶44 Similarly, with regard to the fourth element required for a malicious prosecution action, we have discussed the absence of malice in resolving the immunity statute issue, above. We concluded the Sherners failed to present evidence that the defendants acted with malice.

¶45 Because the Sherners have not come forward with sufficient evidence to raise issues of material fact concerning whether the defendants were responsible for instigating, prosecuting or continuing the prosecution of Peter, or whether the defendants were actuated by malice, we need not consider the other elements of malicious prosecution.

¶46 We hold that the District Court did not err in granting summary judgment to all defendants on the malicious prosecution claim.

## ISSUE FOUR

¶47 **Did the District Court err in setting the amount of costs awarded to three defendants?**

¶48 On December 9, 2003, the District Court entered its order granting summary judgment in favor of the defendants, with the defendants awarded their costs. The Clerk of the District Court mailed copies of this order to all parties that same day and, pursuant to § 25-10-501,

14

MCA, each defendant had 5 days to file what is commonly called a bill of costs--expressed in the statute as "a [verified] memorandum of the items of his costs and necessary disbursements in the action"--and serve notice of such filing upon the Sherners. National, Conoco and Crawford each filed bills of costs on December 16, 2003, and mailed notice of their claimed costs to the Sherners. On December 17, 2003, the District Court entered judgment in favor of the defendants. Handwritten into blanks in the judgment form were the following cost amounts, replicating the amounts stated in the bills of costs filed the previous day: $4,928.20 to National; $8,150.18 to Conoco; and $2,183 to Crawford. Later, on January 6, 2004, the District Court filed a document entitled "Notice," wherein it stated that on December 31, 2003, it had taxed costs as requested by defendants after noting no objection by the Sherners. The court attached a copy of the December 17, 2003 Judgment to the "Notice." In this latter regard, we observe in passing that nothing of record supports the statement in the court's "Notice" that it taxed costs on December 31 after noting no objection.

¶49     The Sherners argue that by entering a Judgment on December 17, 2003, which included the costs requested by the three defendants, the District Court deprived them of the opportunity to object to the bills of costs as permitted by § 25-10-502, MCA. We agree.

¶50     Section 25-10-502, MCA, expressly provides that a party dissatisfied with the amounts contained in a bill of costs filed pursuant to § 25-10-501, MCA, has 5 days after notice of that filing to object by filing and serving a notice of a motion to have the costs

15

taxed. Here, the District Court's Judgment, entered on the day following the filing of the bills of costs and including the amounts stated therein by the defendants, deprived the Sherners of the statutorily-authorized time in which to object.

¶51    *Girson v. Girson* (1941), 112 Mont. 183, 114 P.2d 274, our only decision on this issue, supports this interpretation of the plain language of the statute. There, we briefly addressed a defendant's contention that the trial court erred in entering judgment for costs--that is, the amount of the costs--without allowing him the 5-day period within which to object. Addressing § 9803, RCM (1921)--the predecessor to §§ 25-10-501 and -502, MCA--we agreed, and directed that the judgment be modified by awarding "as costs such sum as will be found proper after the cost bill has been settled in the statutory manner." *Girson*, 112 Mont. at 188, 114 P.2d at 277. As noted, our discussion of the costs issue in *Girson* is brief. It is, however, sufficiently clear with regard to the basic facts before us here--that is, the entry of a judgment including amounts of costs prior to the running of the 5-day objection period--to serve as jurisprudential authority for our plain language statutory interpretation in the present case. It also reflects that nothing in our decision today changes the law concerning procedures for determining the amount of costs available to a prevailing party.

¶52    Conoco and Crawford assert, however, that the Sherners waived their right to appeal this issue by failing to object to the costs below. In a similar vein, National points out that the Sherners did not ask the District Court to amend the Judgment pursuant to Rule 59, M.R.Civ.P.

16

¶53 The District Court having failed to give the Sherners the 5-day period in which to timely object to the costs sought as required by § 25-10-502, MCA, we are hard-pressed to imagine how the Sherners could thereby have waived their right to appeal. They simply had no opportunity to object prior to the entry of the Judgment which included the costs sought. Nor does National advance authority under which the Sherners were required to file a Rule 59 motion. As a result, we need not address these assertions further.

¶54 National also contends the Sherners do not identify on appeal any argument that its cost bill was inappropriate or unsupported by Montana law. National is correct. We observe, however, that the Sherners properly did not request this Court to make determinations required by Montana law to be made by the trial court in the first instance.


¶55 Notwithstanding the somewhat convoluted discussion in the dissent, it is appropriate to respond briefly. The dissent is correct, at ¶ 73, that until the defendants filed their bills of costs, no one knew what costs would be claimed. That is precisely why § 25-10-501, MCA, requires the bill of costs. The notion that, somehow, this transforms the bills of costs into "ascertained" costs at the time the bill of costs is filed is simply not supported by Montana statute or jurisprudence. Indeed, the word "ascertain" does not appear in §§ 25-10-501 or -502, MCA.

¶56 The two statutes, read together, give the prevailing party 5 days to file a bill of costs and the opposing party 5 days to file a notice of a motion to have the trial court tax the costs. By simple logic, the amount of the costs cannot be determined unless and until the 5 days

permitted to the opposing party have passed. If the opposing party timely objects, the trial court must tax the costs. If the opposing party does not object timely, § 25-10-504, MCA, permits the clerk to "ascertain" the costs as the amounts claimed in the bill of costs and enter same into the judgment.

¶57 The dissent's view that somehow our determination of the costs issue here changes law in effect since 1895 is puzzling, since the dissent advances no authority for this view. Indeed, *Gahagan*, on which the dissent relies, supports the result in this case rather than the dissent's view. There, the prevailing plaintiff filed his memorandum of costs and, two days later, the defendant timely filed a notice of motion to tax costs, advised of objections to certain items and requested a hearing before the court to present its objections and then request the court to tax costs. Thereafter, the trial court struck certain items of claimed costs and entered judgment. *Gahagan*, 100 Mont. at 601-02, 52 P.2d at 151-52. We affirmed the trial court's action on appeal. *Gahagan*, 100 Mont. at 612, 52 P.2d at 156. This is precisely the type of procedure which we require in the present case.

¶58 In advancing *Gahagan*, the dissent seems to miss the very point at issue here, which is that the party opposing the bill of costs has a statutory time frame in which to object. Thereafter, the trial court can proceed to tax costs appropriately. Here, unlike in *Gahagan*, the Sherners were denied their statutorily-authorized time to object to the bills of costs.

¶59 Finally, the dissent closes with the thought that trial courts will be involved in every costs proceeding, regardless of whether objection is made. This statement reflects the dissent's basic misunderstanding of our decision here: a losing party must be allowed the

18

5-day period to object and, if timely objection is made, the court is required to tax costs thereafter. If no timely objection is made, § 25-10-504, MCA, comes into play and the clerk may simply accept the amounts claimed as ascertained and insert them into the judgment.

¶60    We hold that the District Court erred in setting the amount of costs awarded to three defendants.

## CONCLUSION

¶61    The District Court's summary judgment in favor of the defendants and dismissal of the Sherners' claims are affirmed. The District Court's January 6, 2004 "Notice" and that portion of its December 17, 2003 Judgment specifying costs are vacated. This matter is remanded to the District Court for further proceedings on costs consistent with this Opinion.

/S/ KARLA M. GRAY

We concur:

/S/ W. WILLIAM LEAPHART
Justice Patricia O. Cotter concurs and dissents.

¶62    I join in the Court's disposition of Issue Four. I dissent from the Court's Opinion on the remainder of the issues.

¶63    The Court's recitation of facts, while correct as far as it goes, is far too cursory. In fact, the Court sets out basically those facts which support its decision. For the most part, it ignores many allegations made by the Plaintiffs--most of which are not in dispute--which raise genuine issues of material fact regarding the motivations of the Defendants in referring

21

Sherner for fraud investigation, and which are deserving of resolution through trial. Among them are the fact that NATLSCO began conducting intermittent surveillance of Sherner as early as October 1996, in order to monitor Sherner's physical activities, on the belief that he was engaging in activities inconsistent with his claimed disabilities. While the Court correctly notes that NATLSCO referred Bernice to the State Auditor (¶ 17), it neglects to mention that it referred Sherner as well. Subsequently, Andersen made the decision to send the surveillance reports to the fraud unit, which came to the conclusion that Sherner was engaging in activities beyond his stated abilities, and that investigation by the Department of Insurance was warranted. In fact, Andersen recommended that Sherner's domiciliary care be terminated for Sherner's performance of activities beyond what a person in his stated condition should be able to perform. Ultimately, when the referral was made to the Auditor's Office for the filing of criminal charges, the Department of Insurance investigator concluded that Sherner was making false or misleading statements about his physical condition, in addition to concluding that he was verifying Bernice's bills for services not provided. Notably, though, in referring Sherner for fraud investigation, neither NATLSCO or Andersen informed the fraud unit that Sherner was undertaking increasingly challenging activities *based upon his treating physicians' recommendations and concurrence*, an omission that the attorney from the Auditor's office, upon learning of it, found quite disturbing. Thus, there was a wholly separate component to the fraud investigation, involving the aggressive referral of Sherner by National and Andersen for fraud in accepting domiciliary care, that the Court largely ignores in its recitation of facts.

22

¶64 While it is true that the actual complaint filed by the Auditor addressed only the alleged billing fraud, the fact remains that the initial referral and investigation did not start that way. It is that referral, based upon a knowingly misleading set of facts, which is the subject of Sherner's allegations. It is against this full backdrop that the Plaintiffs' claims of tortious misconduct and malicious prosecution should have been--but were not--analyzed by the Court.

¶65 Turning to the Court's legal conclusions, I find error there as well, for two reasons. First, the legal conclusions are reached on the basis of an abbreviated and incomplete statement of facts, as noted above. Second, the Court in my judgment failed to apply the correct statutory analysis to the facts before it.

¶66 In resolving Issue One with respect to the entry of summary judgment in favor of Andersen, the Court declined to consider the provisions of § 28-10-702(3), MCA, under which an agent may be held responsible to third persons as a principal when her acts in the course of her agency are wrongful in their nature. We have said that an agent of a corporation may be held personally liable where that agent commits a tort. *Little v. Grizzly Manufacturing* (1981), 195 Mont. 419, 424, 636 P.2d 839, 842. Construing the facts most favorably to Sherner, as we are obligated to do on review of summary judgment, I submit there was a question of fact as to whether Andersen's referral of Sherner for criminal investigation, and her omission of the pertinent medical facts when making that referral, amounted to a tort.

¶67 Turning to Issue Two, under which the Court granted summary judgment to the remaining Defendants based upon immunity under § 33-1-1210, MCA, and Issue Three, under which the Court affirmed the entry of summary judgment to all Defendants on Sherner's malicious prosecution claim, I submit the Court erred here as well. While it is true that these Defendants did not formally commence criminal proceedings against Sherner, they were without question the ones who instigated the investigation. The Court's conclusion to the contrary, see ¶ 45, is simply not supported by the evidence. Instigation is sufficient to satisfy an element of malicious prosecution. Opinion, ¶ 41, and *Plouffe*, ¶ 16. I submit that, at a minimum, the Plaintiffs presented sufficient evidence to suggest that the referral of Sherner (as opposed to Bernice) for prosecution was not supported by probable cause, and was in fact actuated by malice--by a wish to annoy or injure Sherner--and with the intent to both harm Sherner by terminating his domiciliary care, and to benefit the Defendants by terminating their financial responsibility for that care. As we said in *Reece v. Pierce Flooring* (1981), 194 Mont. 91, 96, 634 P.2d 640, 643, if the evidence in a malicious prosecution case, including the reasonable inferences to be drawn therefrom, is susceptible to different conclusions by reasonable men, then the issue of probable cause to support the underlying action should be submitted to a jury. By affirming the entry of summary judgment, we have ignored this rule.

¶68 For the foregoing reasons, I would reverse the entry of summary judgment on Issues One through Three, and remand for trial on the merits. I dissent from our refusal to do so.

/S/ PATRICIA O. COTTER

Justice James C. Nelson joins in the concurrence and dissent of Justice Patricia O. Cotter.

/S/ JAMES C. NELSON

Justice John Warner dissenting.

¶69     I agree with the Court's decision that the Sherners' claims for relief must fail and this action be dismissed.  I strenuously dissent from the Court's remand of this case to re-tax costs.

¶70     In two brief paragraphs for no logical reason, and with no citation to authority, the Sherners state that the judgment of December 17, 2003, was signed in violation of § 25-10-502, MCA, which provides for an objection to the costs sought by defendants.  Based on this simple, unsupported statement, the Sherners argue, without any analysis, that the District Court erred by violating § 25-10-502, MCA.  Even though Sherners did not come up with a reason for their argument, the Court supplies them with one by misapplying a statute, and turns the application of simple cost statutes on its head.

¶71     Section 25-10-502, MCA, states:

> A party dissatisfied with the costs claimed may, within 5 days after notice of filing of the bill of costs, file and serve a notice of a motion to have the same taxed by the court in which the judgment was rendered or by the judge thereof at chambers.

25

¶72    The Court, as its thesis, states in ¶ 50 that by inserting in the judgment the amounts claimed by National, Conoco and Crawford, the District Court deprived the Sherners of their opportunity to object to such costs.  No logical reason for this addition to the statutes is given.  Nowhere in either §§ 25-10-501 or 25-10-502, MCA, is it said, or even hinted, that entering a judgment which contains the amount of costs claimed by the successful parties deprives parties against whom costs are awarded of the opportunity to object to the amount claimed.  The statute most certainly does not say that if blanks in a judgment form are filled in with the amounts of costs claimed, as is the case in this instance, any party dissatisfied with the costs claimed is relieved of the obligation to file the required notice of intent to have costs taxed by the court.  *Girson,* 112 Mont. at 188, 114 P.2d at 277, is not authority for the proposition that entry of judgment automatically precludes the filing of a notice of a motion to have the court tax costs.  The decision gives no facts concerning costs at all, much less any legal analysis.  It does not say whether in that case a bill of costs was timely filed.  Neither does it tell us whether a motion under § 25-10-502, MCA, to have the court tax costs, was timely filed.

¶73    At the time the District Court made its decision that Defendants would be successful, it also determined that they would have their costs.  The amount of costs claimed by the Defendants was at that time unknown to both the court and the Sherners.  So, the amount of costs claimed had to be ascertained.  The claiming parties are the only ones who have the information necessary to do this.  According to the statutory scheme, the court would not become involved at all in assessing costs unless a timely notice of objection is filed pursuant

26

to § 25-10-502, MCA.  Absent an objection, it is unlikely that the District Judge will ever have the amount of costs claimed brought to his or her attention.  Most certainly, the court has no obligation to fix the amount of costs absent an objection.

¶74    After the bills of costs were filed, the Sherners had five days to file a simple, short document that, in effect, says: "You are given notice that we will file a motion to have the District Court tax costs."   If such notice had been filed, the Sherners could later have filed their motion, stated their objections and supported the same.  The three Defendants that filed bills of costs would also have had the obligation to support their claims.  Then, and only then, would the District Court be required to tax costs.  *Gahagan v. Gugler* (1935), 100 Mont. 599, 603-06, 52 P.2d 150, 152-54.

¶75    Montana's statutory scheme for claiming costs, providing for an objection to the claim, and setting strict and short time limits for these actions, is simple, to the point, and designed to not delay the entry of judgment by wrangling over costs.  Obviously, the judgment amount is determined, including costs, the judgment is filed, and the judgment creditor may have execution thereon, right away.  Entry of judgment shall not be delayed for the taxing of costs.  Rule 58, M.R.Civ.P.  However, § 25-10-502, MCA, not unlike Rule 59, M.R.Civ.P., provides the possibility that the amount of judgment may be changed by court order if a timely motion to alter it is successful.  The taxing of costs by entering them in a judgment is in theory an intermediate order.  *Gahagan*, 100 Mont. at 603, 52 P.2d at 152.

¶76    There is no error in how costs were taxed.  The Defendants in this case were entitled to costs by virtue of the summary judgment order entered in their favor on December 9,

27

2003. *See Springer v. Becker* (1997), 284 Mont. 267, 277, 949 P.2d 641, 646; § 25-10-102, MCA. Defendants' right to recover costs was subject to their claiming them by filing bills of costs, which three of them did on December 16, 2003. Section 25-10-501, MCA. The three Defendants claiming costs fulfilled their statutory obligations to obtain their award by timely filing bills of costs.

¶77 Once the amount of the costs claimed was ascertained by the filing of the bills of costs, the Clerk of Court had a statutory duty to include such costs in the judgment within two days. Section 25-10-504, MCA. Nowhere in the statutes is it required that the clerk or the judge figure out how long a party has to file a notice of their intent to file a motion to have the court tax costs, and then wait until it has expired before inserting the amount of costs in the judgment.[1] This requirement is simply pulled from thin air by the Court. Neither the District Judge nor the clerk of court had any obligation to even read the bills of costs, much less analyze whether the amounts claimed were legally correct. The District Court had fulfilled its obligation when the judgment was filed.

¶78 The amounts of costs taxed, which were included in the judgment, were still subject to the Sherners' right to have them taxed by the court. The way to invoke this right was to file a notice of intent to file a motion to have the court, not the claiming parties, determine the costs. Section 25-10-502, MCA; *State ex rel. Kruletz v. District Court of Fifth Judicial Dist.* (1940), 110 Mont. 36, 42, 98 P.2d 883, 886. The Sherners were not deprived of their

---

[1]The record does not tell us in this instance whether the blanks in the judgment form were filled in by the judge or the clerk. However, it is difficult to see how it makes a difference who actually wrote in the numbers.

right to object to such costs simply because costs were taxed when judgment was entered. On the contrary, the Sherners retained their right to object. They also, however, had the obligation to read the bills of costs and determine whether they desired to object to the amounts claimed.

¶79 If they wanted to object to the amount of costs in the judgment, the Sherners had an affirmative duty to, within five days of the service of the bills of costs, file and serve notice of a motion to have the same taxed by the court. Section 25-10-502, MCA. Had the required notice been filed, the court would have had the obligation to consider and tax costs itself. However, because the Sherners failed to file the required notice, their right to have costs taxed by the court was lost. *Kruletz*, 110 Mont. at 42, 98 P.2d at 886.

¶80 From 1895 until today the procedure for taxing costs was rather simple. Section 1867, Mont. Code of Civil Procedure (1895). The parties that were awarded costs, or their lawyers, took the lead. Costs were taxed by claiming them in a sworn bill of costs.[2] If the unsuccessful parties, or their lawyers, were dissatisfied, they could file a notice that they wanted the court to tax the costs. Unless an objection was filed, the court need not get involved.

¶81 Until now the rules were also clear. If the successful parties wanted their costs, they had better get a bill of costs filed and served on time. If the unsuccessful parties were

_____

[2]From 1864, when the first cost statute was enacted, it was determined that the claim must be under oath. Section 412, Bannack Statutes (1864). It makes sense that the bill of costs be verified because the parties, or their lawyers, do this themselves, without court participation.

29

dissatisfied, they had better file and serve a timely notice that they wanted the court to tax costs, or they would have to pay the amount claimed.

¶82 On this day the rules change. Exactly what all of the rules are is difficult to determine from the Court's opinion. But, we now know that if the judge or the clerk is too quick in filling in the blanks the unsuccessful party no longer has to object – it is an automatic reversal on appeal. The courts are now involved in the process even if no objection is made. I have got enough to do and I dissent from the Court's remand to re-tax costs.

/S/ JOHN WARNER

Justice Jim Rice concurring in part and dissenting in part.

¶83 I concur with the Court's opinion with the exception of Issue 4, on the taxation of costs.

¶84 The Court's error is its attempt to force the assessment of costs and the filing of the judgment into a solitary procedure and timeline, when the statutes provide that these two matters can occur separately. Section 25-10-501, MCA, initiates the cost process by providing that the party "in whose favor judgment is rendered" has five days after receiving notice of the verdict or decision to file for costs. Section 25-10-502, MCA, then allows a party who is dissatisfied with the claimed costs, within five days after receiving notice of the prevailing party's cost filing (thus, adding an extra day or days to the process when notice is mailed), to request taxation by the court "in which the judgment was rendered." In other words, the judgment may very well have been entered by then–the judgment can be filed

30

independently of these time frames and is not to be held hostage by a dispute between the parties over costs.

¶85 Indeed, there may well be cases in which an urgency requires a judgment to be immediately entered. The Court's decision today stalls the filing of a judgment until completion of the cost process. There is no authority for requiring such a delay in a judgment's entry, and a prevailing party should not have to choose between claiming costs and having the judgment entered immediately.

¶86 Section 25-10-504, MCA, provides that, if there is no objection to the claimed costs, then the clerk must enter the costs "in the judgment entered up by him." Or, if an objection to costs has resulted in the court taxing costs, the clerk must "if not included in the judgment, insert the same in a blank left in the judgment for that purpose and must make a similar insertion of the costs in the copies and docket of the judgment." Thus, this statute also contemplates that by the time that costs are resolved, the judgment may have already been entered and docketed, and costs are simply added thereto.

¶87 Substantially similar language is found in § 25-9-204, MCA, regarding the clerk's duty to add interest to the judgment:

> **Clerk to include interest in judgment.** The clerk must include in the judgment entered up by him any interest on the verdict or decision of the court, from the time it was rendered or made.

Thus, interest, like costs, is an ancillary issue that does not interfere with the entering of the judgment itself.

¶88 Consequently, I believe the Court errs by holding that by "entering a Judgment" the District Court deprived the Sherners of the opportunity to object to the bills of costs as permitted by § 25-10-502, MCA. *See* ¶ 49. Costs were not finally determined by the entry of the judgment because the two matters function separately. The option of objecting was open, and thereafter, the entered judgment could have been updated by whatever resulted from the cost process. The Sherners failed to file an objection to the costs, and thus waived the opportunity to do so.

/S/ JIM RICE